IN THE UNITED STATES COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED
AUG 14 2023
Nathan Ochsner, Clerk of Court

| | | |
|---|---|---|
| ELDA JUANITA REGALADO<br>Petitioner, | §<br>§<br>§ | |
| v. | §<br>§ | CRIMINAL NO.: 7:09-cr-01757-001<br>&<br>4:12-cr-00773-002 |
| United States of America<br>Respondent. | §<br>§<br>§ | |

**MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)**

COMES NOW, the Petitioner, Elda Juanita Regalado, (hereinafter "Regalado" or "Petitioner") Pro se' and absentia, respectfully moves this Court for COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582 (c)(1)(A). Based on Ms. Regalado's chronic health issues, Ms. Regalado asks this Honorable Court to <u>GRANT</u> her Compassionate Release and amend her sentence to time served and if this Honorable Court deems necessary, a period of time on home confinement as a condition of supervised release.

BACKGROUND

On December 9, 2014 Ms. Regalado was sentenced to 300 months in custody and 10 years of supervised release for Conspiracy to possess with intent to Distribute 50 grams of more of Methamphetamine A Schedule II controlled substance and 30 months for Conspiracy to possess with intent to Distribute and Distribute Marijuana, due to a supervised release revocation. As of July 31, 2023, she has served 128 months. According to the Bureau of Prisons (BOP) inmate locator, Ms. Regalado is scheduled for release on April 17, 2035 and eligible for home detention on October 17, 2035. She is a minimum-security incarcerated individual housed at FMC Carswell in Ft. Worth, Tx. Ms. Regalado is a 61 year old Hispanic female.

1

## JURISDICTION

The Court has the authority to reduce a sentence to time served and modify the term of supervised release to include a term of home confinement pursuant to 18 U.S.C. § 3582 (c)(1)(A). **United States v. Shkambi, 993 F.3d 388, 393 (5th Cir. 2021).** To prevail on a Motion for Compassionate Release, the defendant must show extraordinary and compelling reasons warrant a reduction in sentence and a reduction in sentence and a reduction is consistent with the applicable policy statements issued by the Sentencing Commission. **United States v. Betton, U.S. Dist. LEXIS 46411 (S.D. Miss. Mar. 15, 2022).** The Court must also consider the factors set forth in 18 U.S.C. § 3553 (a) to the extent they are applicable. **United States v. Cooper, 996 F.3d 283, 287 (5th Cir. 2021).**

## ADMINISTRATIVE REMEDIES

Ms. Regalado has satisfied the statutory exhaustion requirement. Section 3582(c)(1)(A) provides two alternative ways of satisfying the exhaustion obligation: (1) "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a Motion on the defendant's behalf" <u>or</u> "the lapse of 30 days from receipt of such a request by the Warden of the defendant's facility," whichever is earlier. 18 U.S.C. § 3582 (c)(1)(A) and Section 603(b)(1) if the First Step Act.

In February of 2023, Ms. Regalado submitted a Compassionate Release to Warden Smith of FMC Carswell, wherein she requested a reduction based on her medical conditions and COVID-19. The Warden denied her request on March 22, 2023. Exhibit: __1__. Because more than 30 days have elapsed since Ms. Regalado's request, this is enough under 18 U.S.C. § 3582 (c)(1)(A). See: **United States v. Dillabaugh, No. 3:18-CR-30062-01-RAL, 2020 WL 3402392, at *2 (D.S.D. June 19, 2020)** ("Based on the plain language of the statute, this Court will consider Dillabaugh's motion because more than 30 days have passed since the Warden received his compassionate release request" even where the Warden denied the request and the defendant did not file an administrative appeal); **United States v. Morehouse, No. 4:18-CR-40019-02-KES, 2020 WL 2836188, at *2 (D.S.D June 1, 2020)** (finding motion was ripe for review on the merits 30 days from the date the Warden received the defendant's request even where the Warden denied the request in the interim).

2

## EXTRAORDINARY AND COMPELLING REASON WARRANT A REDUCTION IN SENTENCE

Section 603(b)(1) of the First Step Act amended 18 U.S.C. § 3582(c)(1)(A) to permit a District Court to grant a defendant's motion for compassionate release if it finds "extraordinary and compelling reasons" warrant such a reduction. See 18 U.S.C. § 3582(c)(1)(A)(i). Ms. Regalado presents the requisite extraordinary and compelling reasons due to her multiple serious health conditions.

Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under Section 3582(c). However, the legislative history to the statute gives an indication of how Congress thought the federal courts should employ the statute. The Senate Committee stressed how some individual cases, even after the abolishment of federal parole, still may warrant a second look at resentencing:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified be changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

S.Rep. No. 98-225, at 55-56 (1983). Congress intended that the circumstances listed in § 3582(c) would act as "safety valves for modification of sentences," id. at 121, enabling judges to provide second looks for possible sentence reductions when justified by various factors that previously could have been addressed through the abolished parole system.

Ms. Regalado submits the following factors, when combined, establish extraordinary and compelling reasons for a reduction of sentence: Medical conditions, Rehabilitation, Prison Conditions, Inadequate Medical Care, Length of time served, and Pursuant to the First Step Act 404(b).

### Medical Condition

Ms. Regalado is currently suffering from the following serious illnesses, conditions, and diagnoses:

- Hyperlipidemia
- Hypertension
- Obesity
- Epilespy/Seizure Disorder
- Tachycardia
- Pre-Diabetes
- Osteoarthristis

3

Ms. Regalado has several of the CDC-identified risk factors that can place her at an increased risk for severe illness from COVID-19 if she contracts it again. While individually, any of these diseases would make complication of COVID-19 perilous. Together, this combination could, and has proven to be extremely dangerous, and even deadly, especially in prison. Each condition is an independent ground to **GRANT** compassionate release.

### Hyperlipidemia

Hyperlipidemia, known typically as high cholesterol, is a condition wherein the blood has too many lipids (fats), increasing fatty deposits in arteries, and thus the risk of blockages. High cholesterol can contribute to heart attacks anytime, but with COVID-19, a virus known for causing blood clots, the fatty deposits present with hyperlipidemia can cause death from stroke. Recently a team from Scripps' Department of Molecular Medicine discovered that cholesterol could be another culprit in COVID-19 deaths, finding that "excess cholesterol also helps the virus bind with ACE2, providing an easy access portal into the cell." These scientists are currently studying the role that cholesterol plays in the process of cell destruction caused by the virus, but note that if confirmed, it would "clarify why obesity, hypertension, respiratory, and cardiovascular disease and diabetes represent such high risk factors for COVID-19 severity and mortality."

Acknowledging the grave risk of coronavirus to people suffering from hyperlipidemia, District Courts have granted Compassionate Release for at-risk incarcerated individuals suffering with that condition:

* **United States v. Scparta, 2020 WL 1910481 at \*9 (S.D.N.Y. Apr. 20, 2020)** (granting compassionate release to inmate with conditions including "hypertension....high blood pressure, and high cholesterol");

* **United States v. Hansen, 1:07-cr-00520-KAM-2, 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020)** (heart disease, hypertension, hyperlipidemia);

* **United States v. Williams, 3:17-CR-121-(VAB)-1, 2020 WL 1974372 (D. Conn. Apr. 24, 2020)** (asthma, hypertension, ADHD, kidney issues, bypass surgery and high cholesterol);

***United States v. Reid, 3:17-cr-001750-CRB-2, 2020 WL 2128855 (N.D. Cal. May 5, 2020)** (Valley Fever, prone to heart disease, because hypertension and high cholesterol);

* **United States v. Connell, 180-cr-00281-RS-1, 2020 WL 2315858 (N.D. Cal. May 8, 2020)** (hypertension, high cholesterol, and pre-diabetes);

4

* United States v. Vo, 15-CR-00310-BLF-2, 2020 WL 2300101 (N.D. Cal. May 7, 2020) (age, hyperlipidemia, hypertension);

* United States v. Ramirez, 1:17-cr-10328-WGY, 2020 WL 2404858 (D. Mass. May 12, 2020) (57 year old man with hypertension, diabetes, and high cholesterol);

* United States v. Sedge, 1:16-cr-00537-KAM, 2020 WL 2475071 (E.D.N.Y. May 13, 2020) (hypertension, hyperlipidemia, and coronary artery disease);

### Hypertension and Obesity

High blood pressure/hypertension is a condition in which the long-term force of the blood against the artery walls is too high, causing the heart and blood vessels to work harder and less efficiently. Over time the friction and force damages delicate tissues inside the arteries. Hypertension consistently lead underlying conditions - present in 53.5% of COVID-19 hospitalizations, with obesity a close second at 49.8%, according to CDC. Hypertension is commonly present in people with obesity and Ms. Regalado has both. The CDC defines severe obesity as BMI of 40 or above, and lists it among conditions that can lead to bad outcomes from the COVID-19 and other illnesses:

> Severe obesity increases the risk of a serious breathing problem called acute respiratory distress syndrome (ARDS), which is a major complication of COVID-19 and can cause difficulties with a doctor's ability to provide respiratory support for seriously ill patients. People living with severe obesity can have multiple serious chronic diseases and underlying health conditions that can increase the risk of severe illness from COVID-19.

Hypertension and obesity put strain on the heart and lungs, making them vulnerable to attacks from the novel coronavirus. Recognizing the dangerousness of these related pre-existing conditions, District Courts have granted Compassionate Release for at-risk incarcerated individuals with them:

* United States v. Ullings, No. 1:10-cr-00406, 2020 WL 2394096 (N.D. Ga. May 12, 2020) (hypertension and obesity);

* United States v. Brown, 4:05-cr-00227-RP-CFB-1, 2020 WL 2091802 (S.D. Iowa Apr. 29, 2020) (hypertension, migraines, low white blood cell count, sleep apnea, nasal onstruction);

* United States v. Hunt, No. 18-20037, 2020 WL 2395222 (E.D. Mich. May 12, 2020) (congestive heart failure, diabetes, asthma, obesity, and sleep apnea);

* United States v. Foreman, No. 3:19-cr-62 (VAB) 2020 WL 2313908 (D. Conn. May 11, 2020) (hypertension and obesity);

* United States v. Jenkins, No. 99-cr-00439-JLK-1, ---F.Supp.3d ---. 2020 WL 2466911 (D. Col. May 8, 2020) (age, TIA, migraines, and obesity "In New York City, researchers have reached similar conclusions. [citation omitted] '[T]he chronic condition with the strongest association with critical illness was obesity, with a substantially higher odds ratio than any cardiovascular or pulmonary disease."');

* United States v. Quintero, No. 08-CR-6007L, ---F.Supp.3d ---, 2020 WL 2175171 (W.D.N.Y. May 6, 2020) (diabetes, a compromised immune system, obesity, and hypertension);

5

* United States v. Ardila, No. 3:03-cr-264 (SRU), 2020 WL 2097736 (D. Conn. May 1, 2020) (diabetes, cardiovascular disease, hypertension, asthma, and obesity);

* United States v. Lacy, No. 15-cr-30038, 2020 WL 2093363 (C.D. Ill May 1, 2020) (severe obesity, hypertension, and diabetes).

### Diabetes

Diabetes is a disease caused by excessive glucose in the blood. The CDC has declared that people with diabetes are at increases risk for complications of COVID-19. Scientists in The Lancet report that diabetes is known to confer increased risk infections generally, and that it is more frequent in patients with severe COVID-19."Diabetes was already a slow-moving pandemic. Now COVID-19 has crashed through like a fast-moving wave," Elbert Huang, professor of medicine and director of the University of Chicago's Center for Chronic Disease Research and Policy, recently said. Doctors have traced the vulnerabilities of diabetes patients to high blood sugar, which can weaken the immune system or damage vital organs; COVID-19 appears to not only thrive in a high-sugar environment, but to exacerbate it. In an effort to address this oncoming wave, District Courts have ordered the release of diabetic incarcerated individuals like Ms. Regalado:

* United States v. Reddy, 2:13-cr-20358-MFL-LJM-1, 2020 WL 2320093 (E.D. Mich. May 11, 2020) (hypertension, Type II diabetes, and orthopedic pain);

* United States v. Guzman Soto, 1:18-cr-10086-IT-1, 2020 WL 2104787 (D. Mass. May 1, 2020) (age (54), hypertension, and diabetes);

* United States v. Pinkerton, 15-CR-30045-3, 2020 WL 2083968 (C.D. Ill. Apr. 30, 2020) (diabetes, hypertension, avascular necrosis);

* United States v. Mattingly, 6:15-cr-00005-NKM-JCH, 2020 WL 2499707 (W.D. Va. May 14, 2020) (diabetes and hypertension);

* United States v. Barber, 6:18-cr-00446-AA, 2020 WL 2404679 (D. Or. May 12, 2020) (hypertension, obesity, and diabetes);

* United States v. Rivernider, 3:10-cr-00222-RNC, 2020 WL 2393959 (D. Conn. May 12, 2020) (diabetes, heart disease, and hypertension);

* United States v. Samy, 2:16-cr-20610-AJT-DRG-1, 2020 WL 1888842 (E.D. Mich. Apr. 16, 2020) (hypertension, heart failure, diabetes, and asthma);

* United States v. Colvin, 3:19-cr-00179-JBA-1, 2020 WL 1613943 (D. Conn. Apr. 2, 2020) hypertension and diabetes);

### Tachycardia

Tachycardia is an excessive rapidity in the action of the heart. The term is usually applied to a heart rate above 100 per minute and may be qualified as atrial, junctional or ventricular, and as a paroxysmal. In August of 2022, Ms. Regalado received a diagnosis of irregular heart arrhythmia called supraventricular tachycardia (SVT) after experiencing spontaneous episodes of recurring palpitations lasting up to thirty minutes. MS. Regalado

spontaneous episodes of recurring palpitations lasting up to thirty minutes. Ms. Regaldo has been hospitalized over four times for this condition. See Exhibits: \_\_\_\_2\_\_\_\_.

At an increased risk other District Courts have granted compassionate releases concerning this health condition, that other incarcerated individuals suffer with like Ms. Regalado:

* United States v. Woodson 2022 U.S. Dist. LEXIS 165107 No. 20-cr-00218-SI-1 (Sept. 13, 2022 9th Cir.) (Tachycardia, obesity, and hypertension);

* United States v. Metheny 2021 U.S. Dist. LEXIS 181036 No. 1:13-cr-00053AA-1 (Sept 22, 2021 9th Cir.) (Tachycardia, obesity, and hypertension);

*United States v. Topete 2021 U.S. Dist. LEXIS 41752 No. 3:05-CR-00257-SLB-HNJ-15, 524 F.Supp. 3d 1201; (Mar. 5, 2021 11th Cir.) (type 2 diabetes, obesity, and a heart condition);

* United States v. Swails 2021 U.S. Dist. LEXIS 10436 No. 04-CR-6177L; 514 F.Supp.3d 551; (Jan. 20, 2021 2nd Cir.) (tachycardia, hypertension, and obesity);

* United States v. Jaramill (D-2) 2021 U.S. Dist. LEXIS 27963 No. 16-cr-20593 (Feb. 16, 2021 6th Cir.) (tachycardia, heart palpitations, high cholestrol, type 2 diabetes);

* United States v. Lopez 2023 U.S. Dist. LEXIS 28288 No. 09-cr-332-10 (Feb 13, 2023 7th Cir.) (tachycardia and atrial fibrillation);

* United States v. Brown 2020 U.S. Dist. LEXIS 237263 No. 06-CR-327 (Dec. 17, 2020 7th Cir.) (hypertension, obesity, tachycardia, type 2 diabetes);

* United States v. Manning 2020 U.S. Dist. LEXIS 84607 No. 15-CR-50007 (Apr. 20, 2020 7th Cir.) (tachycardia and paroxysmal atrial fibrillation)

Ms. Regalado tested positive for COVID-19 in Dec. of 2021 at FPC Bryan, which further attests to the BOP's mishandling of the pandemic. Her medical records indicates that she has been deemed "recovered" means nothing. Ms. Regalado is one of those individuals who is still suffering from the effects of COVID-19 despite being deemed "recovered". In the months following her diagnosis, she has been rushed to the hospital four times due to her heart.

The world has learned that re-infection is possible. In United States v. Waters; the court granted relief for a defendant that has already contracted and recovered from COVID-19 stating, "The Court cannot ignore the potential of re-infection when the risk... is so significant. Cases of re-infection have occurred, and there is still much to learn about COVID-19." No. 18-50008-JLV, 2021 WL 603152, at *6 (D.S.D. Feb. 16, 2021). Ms. Regalado remains vulnerable to COVID-19, and the Court should act not to get her out of harms way.

Ms. Regalado received her first vaccine Jan. 28, 2021. Her second dose Feb. 19, 2021. In addition, her booster was administered on Oct. 15, 2021 and May 7, 2022. In all she still experiences headaches, heart problems that are ongoing, not been able to see a Physician or Specialist for months. Ms. Regalado remains at high risk for the foreseeable future.

## The Risk of Re-Infection and Unknown Long-term Effects of COVID-19

Some Courts have considered an incarcerated individuals recovery from COVID-19 as a factor weighing against finding "extraordinary and compelling circumstances", as the Government may point out. That makes sense in many cases, but it does depend on the circumstances. Indeed, as other Circuits has noted, "actually contracting COVID-19 can also provide a compelling case for relief if coupled with a prison's inability to address the condition and circumstances calling for compassion." **(United States v. High, 997 F.3d 181, 185 (2021).** The state of scientific knowledge about COVID-19, including the likelihood and risks of re-infection, is unsettled. Indeed, there are already reports of new, highly contagious variant in the United States. See, **About Variants, CDC,** https://cdc.gov/coranavirus/2019-ncov/transmission/variant.html (last visited July 27, 2021). The CDC states that "the risk of re-infection also depends on the likelihood of re-exposure to infectious cases of COVID-19," and that "continued widespread transmission makes it more likely that re-infections will occur." See, **Interim Guidance on Ending Isolation and Precautions for Adults with COVID-19, CDC,** https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html (last visited July 27, 2021). Additionally, "the probability of [COVID] re-infection is expected to increase with time after recovery from initial infection because of waning immunity and the possibility of exposure to virus variants." See also, **WORL HEALTH ORG., INTERIM RECOMMENDATIONS FOR USE OF PFIZER-BIONTECH COVID-19 VACCINE** (updated June 15, 2021) (advising continued use of masks even if fully vaccinated).

### Underlying conditions associated with hospitalizations (CDC March 2020 Study)

TABLE. Underlying conditions and symptoms among adults aged ≥18 years with coronavirus disease 2019 (COVID-19)-associated hospitalizations — COVID-NET, 14 states, March 1-30, 2020

| Underlying condition | Overall | 18-49 | 50-64 | ≥65 years |
|---|---|---|---|---|
| Any underlying condition | 159/178 (89.3) | 41/48 (85.4) | 51/59 (86.4) | 67/71 (94.4) |
| Hypertension | 79/159 (49.7) | 7/40 (17.5) | 27/57 (47.4) | 45/62 (72.6) |
| Obesity | 73/151 (48.3) | 23/39 (59.0) | 25/51 (49.0) | 25/61 (41.0) |
| Chronic metabolic disease | 60/166 (36.1) | 10/46 (21.7) | 21/56 (37.5) | 29/64 (45.3) |
| Diabetes mellitus | 47/166 (28.3) | 9/46 (19.6) | 18/56 (32.1) | 20/64 (31.3) |
| Chronic lung disease | 55/159 (34.6) | 16/44 (36.4) | 15/53 (28.3) | 24/62 (38.7) |
| Asthma | 27/159 (17.0) | 12/44 (27.3) | 7/53 (13.2) | 8/62 (12.9) |
| Chronic obstructive pulmonary disease | 17/159 (10.7) | 0/44 (0.0) | 3/53 (5.7) | 14/62 (22.6) |
| Cardiovascular disease | 45/162 (27.8) | 2/43 (4.7) | 11/56 (19.6) | 32/63 (50.8) |
| Coronary artery disease | 23/162 (14.2) | 0/43 (0.0) | 7/56 (12.5) | 16/63 (25.4) |
| Congestive heart failure | 11/162 (6.8) | 2/43 (4.7) | 3/56 (5.4) | 6/63 (9.5) |
| Neurologic disease | 22/157 (14.0) | 4/42 (9.5) | 4/55 (7.3) | 14/60 (23.3) |
| Renal disease | 20/153 (13.1) | 3/41 (7.3) | 2/53 (3.8) | 15/59 (25.4) |
| Immunosuppressive condition | 15/156 (9.6) | 5/43 (11.6) | 4/54 (7.4) | 6/59 (10.2) |
| Gastrointestinal/Liver disease | 10/152 (6.6) | 4/42 (9.5) | 0/54 (0.0) | 6/56 (10.7) |
| Blood disorder | 9/156 (5.8) | 1/43 (2.3) | 1/55 (1.8) | 7/58 (12.1) |
| Rheumatologic/Autoimmune disease | 3/154 (1.9) | 1/42 (2.4) | 0/54 (0.0) | 2/58 (3.4) |
| Pregnancy | 3/33 (9.1) | 3/33 (9.1) | N/A | N/A |

### Prison Conditions

The Center for Disease Control and Prevention recommend that the "best way to prevent illness is to avoid being exposed to this virus," and individuals should avoid close contact with others, as people without symptoms may be able to spread the virus unknowingly, known

8

as "Social Distancing:. Besides social distancing, the CDC also has recommended routine hand washing with soap or hand sanitizer, wearing a fabric face cover and cleaning and disinfecting commonly touched surface on a daily basis.

Public health experts have warned that incarcerated individuals "are at special risk of infection" and are "less able to participate in pro-active measures to keep themselves safe." The conditions in BOP facilities provide a uniquely hospitable environment for COVID-19 to spread. While incarcerated individuals share communal living spaces, such as cells, restrooms, recreation rooms, libraries, exercise yards, and dining halls. Recognizing the unique risks that correctional facilities pose to both incarcerated individuals and employers, Attorney General William Barr has urged the Director of the BOp to prioritize home confinement for incarcerated individuals who are elderly, housed in low minimum secure facilitites, and/or otherwise vulnerable or eligible. even after three years has passed since the virus was effective, COVID-19 is still alive and present in BOP facilities and the current facility that Ms. Regalado is housed at.

### Federal Prisons are Tinderboxes for Infectious Diseases

The federal prisons, says one federal judge, are "tinderboxes for infectious diseases." **United States v. Rodriguez, No. 2:03-CR-271-AB, Doc. 135 at 2 (E.D. Pa. Apr. 1, 2020).** Another sounded the alarm this way: "[T]he COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals" and "each day, perhaps each hour, that elapses threatens incarcerated defendants with greater peril." **United States v. Scparta, No. 1:18-CR-578-AJN-1, Doc. 69 at 18 (S.D.N.Y. Apr. 19, 2020).** Even without widespread testing, demographics reveal that U.S. prisons and jails are COVID-19 "hot spots." The outlook grows mote alarming by the day, all while Ms. Regalado remains in harm's way. If Ms. Regalado would be more vulnerable than most of us in the safety of her own home (and she is), then what is the danger inside a federal Prison?

### The Conditions of Prison Foster Spread of the Virus

The CDC, the White House, and Governor Walz have all urged vulnerable people to take immediate, preventive actions, including avoiding groups of people, washing hands frequently with soap, and staying home, separated from other people. This is a hopeless set of guidelines for federal incarcerated individuals, who lack any ability to protect themselves in these urgent ways. People in prisons and jails are uniquely vulnerable to the COVID-19 virus. According to Dr. Jaimie Meyer, an infectious disease expert and professor at Yale School of Medicine, incarcerated individuals are particularly vulnerable because "[t]he risk posed by infectious diseases in jails and prisons is significantly higher than in the community,

9

both in terms of risk of transmission, exposure, and harm to individuals who become infected." In her declaration, Dr. Jaimie Meyer describes the inadequate pandemic preparedness plans in many detention facilities and the difficulty of separating infected or symptomatic inc incarcerated individuals from others. In short, the coronavirus is highly transmissible, extraordinarily dangerous, and poses a sever threat to even healthy federal incarcerated individuals.

The conditions of incarceration foster, rather than limit, the spread of the virus. Conditions of confinement allow the contagious disease to thrive. Incarcerated individuals arrive at BOP facilities from all over the country, and people who work in facilities leave and return daily. Public health experts believe that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings." The social distancing that experts advocate as essential to limiting the spread of COVID-19 is impossible in jail and prison facilities. Crowding, inadequate ventilation, and security issues all contribute to the spread of infectious disease.

Based on the particularly infectious nature of the virus, the CDC and state governments have advised individuals to practice social distancing and good hygiene. But social distancing can be difficult for individuals living or working in a prison. Indeed, conditions of imprisonment create the ideal environment for the transmission of infectious diseases. As the CDC noted, "[i]ncarcerated /detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced. The CDC thus recognizes the herculean challenge of keeping prison facilities insulated from COVID-19:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to Court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

Limited space and over population, inadequate ventilation, and lack of resources all contribute to the spread of infectious disease in jails and prisons. The federal prison system simply is not, in spite of its best efforts, capable of preventing a harrowing outbreak. "[T]he agency is in chao."

<u>Rehabilitation</u>

Ms. Regalado has demonstrated remorse and deep contrition by utilizing every opportunity for self-betterment. Regalado received a certificate for Office Specialist from Blinn College. Regalado has completed 1,036-hours of successful EBRR and Productive Activities according to the First Step Act of 2018. Regalado has completed numerous hours of BOP Adult Continuing Education (ACE) and the Release Preparation Program (RPP) courses. See Exhibit: ___3___ (BOP Education Data Transcript).

Courts in this district and the Fifth Circuit have granted Compassionate Release based on rehabilitation and other factors. **United States v. Guston**, 2021 U.S. Dist. LEXIS 8237 **(S.D. Miss. Jan. 15, 2021)** (medical conditions and rehabilitation); **United States v. Hudec**, 2022 U.S. Dist. LEXIS 104763 **(S.D. Tex. June 9, 2022)** (change in law and rehabilitation); **United States v. Cleveland**, 2022 U.S. Dist. LEXIS 31445 **(N.D. Tex. Feb. 23, 2022)** (changes in the law and rehabilitation); **United States v. Davis**, 2021 U.S. Dist. LEXIS 213370 **(S.D. Tex. Nov. 4, 2021)** (medical conditions and rehabilitation); **United States v. Taylor**, 2020 U.S. Dist. LEXIS 193381 **(E.D. La Oct. 19, 2020)** (medical conditions and rehabilitation); **United States v. Camacho**, 2020 U.S. Dist. LEXIS 139282 **(W.D. La Aug. 4, 2020)** (amount of time served and rehabilitation).

Courts have granted Compassionate Release based in part on rehabilitation. Elda Regalado's rehabilitation efforts and overall good conduct presented extraordinary and compelling reasons for a reduction in sentence. In **United States v. Randall**, 837 Fed. Appx. 1008, 1009 **(4th Cir. 2021)**, the Court held that "a District Court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation." In **United States v. Malone**, 2021 U.S. Dist. LEXIS 108022, at *14 **(N.D. Okla. June 9, 2021)**, the Court held "evidence of post-sentence rehabilitation is likely the most critical of core considerations for the Court in a § 3582(c) proceeding." In **United States v. Hebert**, 2021 U.S. Dist. LEXIS 239059, at *10 **(E.D. Tex. Dec. 8, 2021)**, the Court held "While rehabilitation alone is not ab extraordinary and compelling reason justifying Compassionate Release, it can be a factor warranting a reduction when an inmate has an otherwise qualifying condition." The Fourth Circuit held that successful rehabilitation efforts can be considered as "one among other factors" establishing extraordinary and compelling reasons for release. **United States v. Harris**, 2022 U.S. App. LEXIS 5823 **(4th Cir. Mar. 4, 2022)**.

### Length of Time Served

Regalado has served more than 45% of her sentence. Since the DSCC re-calculated Regalado's FSA time credits, Reglado will have served more than 60% of her sentence. The Court can order time served and modify the supervised release to include home confinement. Numerous Courts have released defendants who have served less than half their term. Donald

11

McKinney served eighteen months of his 120-month sentence. **United States v. McKinney**, 2020 U.S. Dist. LEXIS 97975 (W.D. N.Y. June 4, 2020). The Court reduced the sentence to time served and ordered McKinney to serve the remainder of the sentence on home confinement. Id. Marvin Barber served six months of his sixty-month sentence. **United States v. Narber**, 466 F. Supp. 3d 1127 (D. Or. 2020). The Court reduced the sentence to time served and ordered Barber to serve the remainder of his sentence on home confinement. Id. Ernesto Delgado served 29 months of his 120-month sentence. **United States v. Delgado**, 2020 U.S. Dist. LEXIS 84469 (D. Conn. Apr. 30, 2020). The Court reduced the sentence to time served and ordered Delgado to serve the remainder of his time on home confinement. Id.

## 18 U.S.C. § 3553 FACTORS

A review of the § 3553(a) factors, to the extent they apply, weigh in favor of an immediate reduction in Regalado's sentence (Compassionate Release), and a reduction would not undermine the goals of the defendant's original sentence. These factors are to considered by the Court when it makes its decision in the case at bar.

1. **18 U.S.C. § 3553(a)(1) – the nature and circumstances of the offense and the history and characteristics of the defendant.**

   A. Nature and Circumstances

The nature and the circumstances of this case were serious. Regalado does not seek to justify, dimmish, or detract from the seriousness of her offense, and she unequivocally accepts responsibility for her conduct. However, Regalado needs to be home to receive better and adequate medical care.

   B. History/Characteristics of Defendant

Regalado has served more than 45% of her sentence, and her rehabilitative efforts are relevant to her "the history and characteristics." **Pepper v. United States**, 562 U.S. 476, 491 (2011) (citing 18 U.S.C. § 3553(a)(1)). Numerous Courts have considered a defendant's rehabilitation in granting Compassionate Release. **United States v. Brown**, 2020 U.S. Dist. LEXIS 87133, at *12, 17-18 (S.D. Iowa Apr. 29, 2020); **United States v. Decator**, 2020 U.S. Dist. LEXIS 60109, at *10 (D. Md. Apr. 6, 2020); **United States v. Redd**, 2020 U.S. Dist. LEXIS 45988, at *23 (E.D. Va. Mar. 16, 2020); **United States v. Perez**, 2020 U.S. Dist. LEXIS 45635, at *7 (D. Kan. Mar. 11, 2020) (finding that inmate's rehabilitation favored Compassionate Release where inmate "gained his GED while in prison and has availed himself to various educational programs.").

2. **18 U.S.C. § 3553(a)(2)(A) – the need to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment.**

Regalado plead guilty, accepted responsibility for her actions. Other Circuits have explained that "the need to provide respect for punishment, the need to reflect the seriousness of the offense, and the need to promote respect for the law permit the Court to consider the amount of time served in determining whether a sentence modification is appopriate." **United States v. Kincaid, 802 F. Appx. 187, 188-189 (6th Cir.)** As the late Justice Anthoney Scalia observed,

> Few facts available to a sentencing judge.... are more relevant to the likelihood that [a defendant] will transgress no more, the hope that he may respond to rehabilitative efforts to assist with a lawful career, [and] the degree to which he does or does not deem himself at war with his society that a defendant's willingness to cooperate.

**United States v. Mitchell, 526 U.S. 314, 339 (1999)** (quoting **Roberts v. United States, 445 U.S. 552, 558 (1980))**.

### 3. 18 U.S.C. § 3553(a)(2)(B) - the need to afford adequate deterrence to criminal conduct.

In terms of both specific and general deterrence, there is overwhelming evidence in the scientific literature that "the certainty of being caught is a vastly more powerful deterrent than the [severity of the] punishment. Ms. Regalado is unlikely to engage in such behavior again considering her current health status. **United States v. Browning, 2021 U.S. Dist. LEXIS 38058, at \*12-13 (E.D. Mich. Mar. 2, 2021)**.

**Browning** quotes the finding made by the United States Department of Justice (DOJ) article entitled, "Five Things About Deterrence 1, ar 12-13 (2016), which states:

> Severity refers to the length of a sentence. Studies show that for most individuals convicted of a crime, short to moderate prison sentences may be deterrent but longer prison terms produce only a limited deterrent effect.
>
> Certainty refers to the likelihood of being caught and punished for the commission of a crime. The research underscores the more significant role that certainty plays in deterrence than severity - it is the certainty of being caught that deters a person from committing a crime, not the fear of being punished or the severity of the punishment. Effective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration. In addition, there is no evidence that the deterrent effect increases when the likelihood of conviction increases. Nor is there any evidence that the deterrent effect increases when the likelihood of imprisonment increases.

See also Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Just. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased [by longer sentences].").

Ms. Regalado is unlikely to engage in such behavior again considering her current health status. As for specific deterrence, Ms. Regalado at this juncture has little need for deterrence, given that her sentence already has provided substantial (if not maximal deterrence) and (even more to the point) that her medical condition likely leaves her disinclined to engage now in criminal conduct from which she needs to deterred. As for general deterrence, a sentence reduction under these circumstances would not undermine the deterrent effect of the sentence upon a hypothetical member of the public familiar with Ms. Regalado's case, who would realize that service of the original sentence awaited Ms. Regalado had not become ill.

### 4. 18 U.S.C. § 3553(a)(2)(C) – the need to protect the public from further crimes of the defendant.

Regalado has a BOP First Step Act (FSA) Recidivism Risk Assessment (RRA) Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN) score of minimum and is housed at a low facility. See Exhibit: __4__ (BOP FSA RRA PATTERN Score). Nathan James, a Congressional Research Crime Policy Analyst, writes that "[t]he assessment of offender risk was originally a matter of professional judgment." See Risk and Needs Assessment in the Federal Prison System 2018. However, "[b]ecause Courts and Correctional Officials make decisions every day about who can safely be diverted from incarceration or granted early release, they may benefit from ... [a]ctuarial risk assessment tools." Id. Although "risk and needs assessment tools are not 100% accurate, ... the best models are usually able to predict recidivism with about 70% accuracy." Id.

Numerous Courts have considered a defendant's PATTERN score when reducing sentences. United States v. Bell, 2021 U.S. Dist. LEXIS 43744, at *10 (S.D. Miss. Mar. 9, 2021); United States v. Hansen, 2020 U.S. Dist. LEXIS 230835, at *16 (W.D. Tex. Dec. 9, 2020); United States v. Taylor, 2020 U.S. Dist. LEXIS 193381, at *9 (E.D. La. Oct. 9, 2020); United States v. Carter, 2020 U.S. Dist. LEXIS 206919 (W.D. Pa. Nov. 5, 2020).

### 5. 18 U.S.C. § 3553(a)(2)(D) – the need to provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

#### A. Educational/Vocational Training

Regalado completed the Office Specialist Certificate Program from Blinn College. She will be able to be gainfully employed in an office job paying decent legal funds upon her release. See Exhibit: __5__.

### B. Medical Care

The focus in this case plainly is on the need for adequate medical care. Ms. Regalado is ill. Suffering with Heart Failure even without COVID-19 increases her chance at death, consistent elevated Heart Rate, Uncontrolled Hypertension, Obesity, Pre-Diabetes, Epilepsy/ Seizure Disorder, and Osteoarthrisits. Ms. Regalado's need for medical care is great. And this factor is certainly broad enough to encompass the need for other kinds of end-of-life emotional and spritual (as well as medical) care, and suffice it to say that delivery of such care surely would be delivered more humanely and satisfactorily outside of BOP custody than inside BOP custody (to extent it could be delivered in BOP custody at all).

Numerous Courts have granted Compassionate Release based on inadequate medical care. **United States v. Stanley,** 2022 U.S. Dist. LEXIS 17494 (E.D. Cal. Jan. 28, 2022) (BOP delayed cancer treatment due to COVID); **United States v. Valencia-Lopez,** 2022 U.S. Dist. LEXIS 11461 (E.D. N.Y. Jan. 21, 2022) (BOP failed to provide medical attention due to COVID restrictions); **United States v. Robinson,** 2022 U.S. Dist. LEXIS 6233 (D.C. D.C. Jan. 12, 2022) (BOP failed to treat kidney failure).

Since the pandemic, Regalado contracted COVID as confirmed by the Texas Department of Health. Regalado continues to experience shortness of breath and difficulty sleeping and believes she is suffering from "long-COVID." Despite being fully vaccinates and boosted, medical experts state that it is impossible to surmise exactly how likely Regalado is to become ill again, but recent studies indicate that there are significant changes of a person developing long-term health impacts after contracting COVID. **United States v. Stephens,** 2022 U.S. 30655 ((D. Mont. Feb. 22, 2022). Numerous Courts have released prisoner based on the long-term effects of COVID. **United v. Martinez,** 2022 U.S. Dist. LEXIS 7280 (S.D. Cal. Jan. 13, 2022) (Martinez was released because of the prison conditions and the possibility he would again contract COVID); **United States v. Yellin,** 2020 U.S. Dist. LEXIS 112786 (S.D. Cal. June 20, 2020) (Yellin was released because it was not known how long COVID immunity lasts).

### REENTRY PLAN

Regalado will live with her daughter, Crystal Mireles, at 1019 Yellow Hammer St., Rio Grande City, Texas 78582. Crystal Mireles can be reached at 956-874-5403. Since Regalado has a Certificate in Office Specialist, she can work either full time or part-time earning money to help support her family. She has a guaranteed job at MI MED SPA WELLNESS & BEAUTY at 5206 East Hwy 83 Rio Grande City, Tx 78582.

### DANGER TO SOCIETY

Regalado is housed at a medical facility. At her previous facility, FPC Bryan, a Federal Prison Camp, she worked as the head orderly for her Unit Team staff. Was trusted and freely to clean and sanitize her Unit Teams offices, conducting several safety-related inspections and delivering disinfectant chemicals to combat COVID. Regalado poses no danger to any person or the community, she knows the consequences of any type of misbehavior, and she would never put herself, her family, or the public in jeopardy.

In the case of **United States v. Marks, 455 F.Supp. 3d 17 (W.D. N.Y. 2020)**, the Court found that any risk of danger associated with a sentence reduction "can be mitigated by supervised release." In **United States v. Williams, 2020 U.S. Dist. LEXIS 63824, at *9 (N.D. Fla. Apr. 1, 2020)**, the Court noted with respect to Williams' Motion for Compassionate Release, that while "the Court cannot conclude ... that he poses no risk at all to public safety ... the risk of him engaging in further criminal conduct is minimal and can be managed through ... the terms of his supervised release." See also **United States v. Mondaca, 2020 U.S. Dist. LEXIS 37483, at *13 (S.D. Calif. Mar. 3, 2020)**, the Court noted that the inmate's Compassionate Release posed minimal danger because the inmate "will be supervised by the Probation Department upon his release from custody through a five-year term of supervised release." For all practical purposes, in determining whether a defendant poses a danger, their progress toward rehabilitation is an important consideration. **United States v. Seals, 509 F.Supp. 3d 259, 264 (E.D. Pa. 2020)**.

At sentencing, the Court imposed a term of ten years supervised release on Regalado. Considering Regalado's maturity along with her efforts toward rehabilitation, as well as her exceptional good conduct while in prison, it is almost certainty Regalado will never engage in any type of further criminal activity when she is released from incarceration.

The Court cannot undo the past and is instead tasked with assessing Regalado's dangerousness. In doing so, it must look beyond the underlying offense to her conduct while incarcerated. **Douglas, 2021 U.S. Dist. LEXIS 10755, at *23**; see also, **Brown v. United States, 2020 U.S. Dist. LEXIS 238008, at *17 (D. Md. Dec. 17, 2020)** (Defendant's "behavior for the past 20 years, while in BOP custody, is an important indicator of whether he remains a danger to the community."). **United States v. Seals, 509 F.Supp. 3d 259, 264 (E.D. Pa. 2020)** ("But for all practical purposes, in determining whether a defendant poses a danger, their progress toward rehabilitation is an important consideration.").

In **United States v. Jacobs, 470 F.Supp. 3d 969, 977-978 (S.D. Iowa 2020)**, the Court stated noncustodial sentences curtail "prized liberty interests" and "the defendant always faces the harsh consequences that await if he violates the conditions" attached to such a sentence. **United States v. Gall, 374 F.Supp. 2d 758, 763 (S.D. Iowa 2005), rev'd, 446 F.3d**

16

884 (8th Cir. 2006), rev'd, 552 U.S. 38 (2007). Such restrictions also promote respect for the law, protect the public, and do not constitute any endorsement of Regalado's conduct.

Regalado is not the same person who stood before the Court for sentencing, and she does not pose any type of threat to any individual or society at large. The impact of her confinement has been one of nightmare proportions. Regalado's adjustment has been a very difficult one, but she has made the best of all given situations. Regalado respects all law enforcement personnel, including Bureau of Prison staff who would concur that she has exuded exemplary behavior. The Court may reduce the sentence to time served and modify the term of supervised release to include home confinement. **United States v. Brown, 2021 U.S. Dist. LEXIS 91312 (W.D. Pa. May 13, 2021).**

## CONCLUSION

The COVID-19 virus has killed or caused lasting damage to thousands of infected people, with those most vulnerable because of pre-existing medical conditions suffering disproportionately. If Ms. Regalado gets infected again with the virus, because of her hypertension, hyperlipidemia, tachycardia, and obesity, it is likely that she will suffer from acute respiratory distress syndrome, and she will end up on a ventilator. If ARDS does not imperil her life, a blood clot could get stuck in a vessel or artery damaged by high blood pressure and constrict the flow of oxygen to her organs, including her brain, causing a stroke. She could have a heart attack. The elevated cholesterol in her blood will facilitate a faster, more insidious invasion of the virus into her cells, and the elevated glucose will further exacerbate an already emergency situation. If she gets the virus again, her life will be in danger. Every day in confinement she risks exposure to this novel disease that could kill her. If this does not constitute "extraordinary and compelling reasons," nothing could.

This Court has the authority and ability to turn Ms. Regalado's medical outlook from grave to promising. She has served 128 months, which is an eternity considering where the world is now compared to where it was, and where she was, 10 plus years ago. Further incarceration is not necessary and is dangerous to her health. The law provides a way to relieve her from this danger. Moral obligation requires it. Federal Courts all over the nation have granted Compassionate Release Motions (and immediate release) to vulnerable incarcerated individuals imperiled by the COVID-19 epidemic. She now implores this Court to find that her sentence is satisfied effectively granting her Compassionate Release.

Ms. Regalado presents "extraordinary and compelling reasons" in support of Compassionate Release as envisioned by the passage of the First Step Act. If sentenced today Regalado would

not receive the sentence that she received ten years ago. Granting a reduction in sentence would not undermine the goals of sentencing under 18 U.S.C. § 3553(a) and is consistent with any policy statements. Regalado poses no danger whatsoever to the community.

**WHEREFORE**, In the interest of justice, the Court should conclude that it is unnecessarily punitive to keep Regalado imprisoned any longer, and she respectfully moves the Court to reduce her sentence to time served, and, if this Court deems it necessary, modify the supervised release term to include home confinement. Her life is in this Court's hands.

Respectfully Submitted,

*Elda Juanita Regalado*
Elda Juanita Regalado
#80948-079
Defendant pro se
FMC Carswell
P.O. Box 27137
Ft. Worth, Texas 76127

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY under penalty of perjury, I placed a copy of the foregoing **Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)** upon the following addresses, by placing same in a sealed envelope, bearing sufficient postage for the delivery via United States mail Service to:

Arthur R. Jones
1000 Louisiana St. Suite 2300
Houston, Texas 77002

which was hand delivered to prison authorities on the grounds of the Federal Medical Center Carswell, in Ft. Worth, Texas on this 8th day of August, 2023. Litigation is deemed FILED at the time it was delivered to prison authorities. **Houston v. Lack. 101 LED 2d 245 (1988).**

Respectfully Submitted,

*Elda Juanita Regalado*
Elda Juanita Regalado
#80948-079